# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

YVONNE MEADOWS, et vir., Larry Meadows,
     **Plaintiff,**

-vs-                   Case No. A-08-CA-819-SS

JANIE BRAXDALE and LAKE TRAVIS
INDEPENDENT SCHOOL DISTRICT,
     **Defendants.**

## **O R D E R**

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically the Plaintiffs Yvonne Meadows, et vir., Larry Meadows ("Plaintiffs")' Motion for Relief From Judgment and to Strike [#61], Defendant Lake Travis Independent School District ("LTISD")'s response [#62], and Plaintiffs' reply [#63]. Having considered the motion, the response, the reply, the relevant law, and the case file as a whole, the Court enters the following opinion and order.

### **Background**[1]

Plaintiffs Yvonne Meadows and Larry Meadows are parents whose three children attended Bee Cave Elementary School in Lake Travis ISD from 2005 through 2006. Pls.' First Am. Compl. ¶ 8. In the fall of 2006, Mrs. Meadows was refused permission to enter the "secure" areas of Bee Cave Elementary School (defined, essentially, as the areas of the school where students were located during school hours such as the classrooms, lunchroom, etc.) under a new visitor's policy referred to as "Regulation FFF" that required all school visitors to submit a driver's license or certain

---

[1]A more extensive background of this case can be found in this Court's order, entered on August 18, 2009, granting Defendants' motion for summary judgment. *See* Order [#51].

information found on their driver's license for a sex offender background check prior to being permitted unescorted access to the secure areas of the school.

Plaintiffs filed suit in the 250th Judicial District Court of Travis County, Texas on September 25, 2008 against Janie Braxdale, principal of Bee Cave Elementary School, in her official and individual capacities,[2] and Lake Travis Independent School District ("LTISD"). Plaintiffs brought suit under 42 U.S.C. § 1983 for alleged violations of the First Amendment rights of free speech, assembly, and association, the Fourth and Fifth Amendments right to be secure from unreasonable search and seizure, the First, Fourth, Ninth and Fourteenth Amendments right to privacy, and the Fourteenth Amendment rights to procedural and substantive due process.[3] Pls.' First. Am. Compl. ¶¶ 27–37. Plaintiffs also asserted state law claims under the Texas Education, Family, Transportation, and Government Codes and for common law intentional infliction of emotional distress. *Id*. ¶¶ 22–26, 38–40. Plaintiffs requested monetary, declaratory, and injunctive relief. *Id*. ¶¶ 41–43. Defendants removed the case to the Western District of Texas on November 7, 2008 based on federal question jurisdiction under 28 U.S.C. §§ 1331, 1441.

## II. Regulation FFF

LTISD adopted and enacted Regulation FFF in response to an incident that occurred during the 2004–2005 school year.[4] "[T]he incident spurred discussion at the school, and within the District

---

[2] All claims against Janie Braxdale in her individual capacity were dismissed without prejudice on July 7, 2009. The remaining claims asserted against Braxdale were redundant to the claims asserted against LTISD, thus the Court treated those remaining claims as being against only LTISD.

[3] Plaintiffs also asserted violations of the corresponding provisions of the Texas Constitution.

[4] Specifically, an unidentified man entered the campus of the Lakeway Elementary School one day during school and exposed himself to a fifth grade student. Def.'s Mot. for Summ. J. Ex. 5, Declaration of Diana Frost ("Frost Decl.") ¶ 4. Even Ms. Meadows recognizes this event occurred and admits being disturbed LTISD did not begin stricter visitor procedures at all of its campuses sooner than they did.

as a whole, regarding school security," and focused on requiring visitors to check in at the main office before accessing other parts of the school and "any mechanism for identifying whether a visitor was a registered sex offender or otherwise presented a threat to the security of the campus." Def.'s Mot. for Summ. J. Ex. 5, Declaration of Diana Frost ("Frost Decl.") ¶ 4. To accomplish these goals, LTISD sought out private vendors of visitor management systems and selected Raptor Technologies, Inc. ("Raptor") for its "features, cost effectiveness, user friendliness, and ability to meet the District's stated goals." *Id*. ¶¶ 4–5. LTISD then instituted a pilot project using Raptor at Lakeway Elementary School for the 2005–2006 school year, and based on the success of the pilot program LTISD began efforts to implement the Raptor system district-wide starting in the fall of 2006. *Id*. ¶¶ 5–8.

Prior to Raptor's district-wide implementation, LTISD officials drafted Regulation FFF to assist with Raptor's implementation and explain the purpose and use of the Raptor system. *Id*. ¶¶ 8, 11. In addition to electronically checking all school visitors against registered sex offender databases, Raptor replaced the paper sign-in sheets and allowed schools to make and issue photograph visitor badges and electronically monitor volunteer hours. *Id*. ¶ 10. The procedures established by Regulation FFF and its purposes are summarized as follows:

> Under Regulation FFF, all campus visitors are required to provide a state-issued form of photo identification prior to entering the secure areas of a school building where students are located. School employees responsible for receiving school visitors must scan the identification card through the Raptor System. The system then creates an electronic photo image of the first and last name, date of birth, and photograph located on the front of the identification card. The system uses the name and birth date information to perform a search against publically available national sex offender registries to determine whether the person seeking entry to a school campus is a sex offender. The system does not perform any other criminal history record search other than the search for sex offender status. The photograph on the front of the identification card is used so that staff can verify the physical appearance of the person seeking access to the campus and so the system can create a name badge with

the visitor's full name, date, picture, and destination printed on the badge. The visitor badge allows school staff to quickly identify who does and does not have authorization to be on school campus. Anyone on a school campus without a District name badge, or a visitor name badge generated by the Raptor System with the current date, must be escorted to the office under Regulation FFF.

*Id*. ¶ 12. Raptor has been endorsed by the United States Department of Justice, received federal grant money, and was used by 1,400 schools in 100 school districts in 10 states across the country at the time LTISD initially purchased it. *Id.* ¶ 13. LTISD notified parents of the new visitors policy by putting up signs on campus entry doors and in campus main offices, publishing articles in campus and district newsletters, and posting information on the district's website. *Id*. ¶ 14.

## III. Mrs. Meadows Goes to School

On September 28, 2006, Mrs. Meadows arrived at Bee Cave Elementary School to attend two previously scheduled parent-teacher conferences with her children's teachers. Pls.' Resp. Ex. 1, Aff. of Yvonne Meadows ("Mrs. Meadows Aff.") at 5. Mrs. Meadows went to the school office to let school officials know she had arrived and was asked for her driver's license. *Id*. Mrs. Meadows asked why she was being asked to provide identification when the receptionist knew who she was, and was directed to a sign regarding the Raptor System. *Id*. Mrs. Meadows then refused to provide her driver's license.[5] *Id*. A second administrator asked her to orally provide her name and date of birth. *Id*. Mrs. Meadows provided her name but refused to provide her date of birth, since the administrator "was eliciting the same information as was on my driver's license." *Id*. Mrs. Meadows then questioned Principal Braxdale about the system and was informed "that the purpose was to check for registered sex offenders." *Id*. Mrs. Meadows continued to refuse to submit her

---

[5]Although Mrs. Meadows refused to provide her license on September 28, 2006, the Court notes the undisputed evidence establishes she permitted the school to make and keep a paper copy of her driver's license when she enrolled her children in 2005. Mrs. Meadows Aff. at 4.

information for use with the Raptor system, and therefore was not permitted to enter the secure areas of the school, specifically her children's classrooms or the hallway. *Id*. at 5–6; Def.'s Mot. for Summ. J. Ex. 4, Aff. of Janie Braxdale ("Braxdale Aff.") ¶ 13. Instead, her children's teachers met with her for the parent-teacher conferences in a conference room in the main office suite. *Id*.

Several days later, on October 12, 2006, Mrs. Meadows again visited the Bee Cave campus to attend her son's musical. Mrs. Meadows Aff. at 7. Mrs. Meadows again refused to provide her driver's license or allow the school to manually enter her information into the Raptor system. Braxdale Aff. ¶ 14. Mrs. Meadows spoke with Principal Braxdale, who refused to allow her unescorted access to the performance but did personally escort her to and during the performance. *Id*. Braxdale informed Mrs. Meadows that, per district policy, she would only be allowed two escorted visits and then would be denied access to the secure areas of the school. *Id*. Mrs. Meadows asked Braxdale how she could file a complaint and was provided a grievance form. Mrs. Meadows Aff. at 7.

Once again, in early November Mrs. Meadows visited the Bee Cave campus. The specific details of this visit are unclear. Mrs. Meadows claims she was there to attend an after school volleyball game, called in advance to make sure she could attend unescorted, was never escorted, and in fact did not enter the main doors but rather went directly to the gym. *Id*. Braxdale, however, recalls Mrs. Meadows attending an after school physical education program in which her son was involved, and states it is her understanding Mrs. Meadows was escorted to that program. Braxdale Aff. ¶ 15.

Mrs. Meadows' last visit to the Bee Caves campus was in November 2006 for the school's annual Thanksgiving lunch, during which parents are permitted to attend lunch with their children.

*Id*. ¶ 16. Mr. Meadows was permitted to attend the lunch because his information had previously been entered into and screened by the Raptor system, but Mrs. Meadows continued to refuse to provide her information. *Id*. As a result, Mrs. Meadows was denied entry to the lunch. *Id*. Mrs. Meadows' driver's license information was never entered into the Raptor system. *Id*.

### III. Procedural History

Defendant LTISD moved for summary judgment on all of Plaintiffs' claims on July 15, 2009. On August 18, 2009, the Court entered an order granting LTISD's motion for summary judgment as to every claim, and subsequently entered judgment against Plaintiffs in this case. *See* Order [#51]; J. [#52].

On November 13, 2009, almost 90 days after the date judgment was entered, Plaintiffs filed their present "Motion for Relief from Judgment and to Strike." *See* Pl.'s Mot. [#61]. The Court turns to that motion now.

**Analysis**

### I. Plaintiffs' Allegations

The basis for Plaintiffs' motion for relief from judgment is their assertion that "clear and convincing evidence exists that [LTISD] and/or its attorneys engaged in misconduct"; namely, Plaintiffs allege LTISD submitted as summary judgment evidence a version of Regulation FFF ("Version 2") that was different from the version in effect at the time of the circumstances giving rise to this case ("Version 1"). *Id.* at ¶¶ 1-2. The difference between the two versions is relatively slight: Plaintiffs allege Version 2 contains a single additional phrase, which does not appear in the same paragraph in Version 1. That phrase is underlined below:

**Parents/Guardians of Students at the School/Facility**

> All parents/guardians attempting to gain access to the school/facility for the first time will present a valid driver's license from any state, an official state photo identification card from any state and many countries, or military identification card for scanning. Parents/guardians refusing to produce such ID may be asked to leave the school/site as their identity cannot be verified. School principals and site administrators *may* allow limited access based on their personal understanding of the situation and/or knowledge of the person in question <u>if the driver's license has already been scanned into the system</u>. Such persons, however, should be manually entered into the system by the campus administrator and have their names checked against the database (no more than twice).

*Id.* at Ex. C (Version 2 of Reg. FFF). The rest of the quoted paragraph is undisputedly identical in both Version 1 and Version 2 of the regulation. Plaintiffs refer to Version 2, quoted above, as a "fraudulently altered version of Regulation FFF," which was presented by LTISD and its counsel in discovery and in their pleadings. *Id.* at ¶ 3. Plaintiffs claim they only discovered the "alteration" in Version 2 while preparing for their appeal, and thus raise the issue only now. *Id.* at ¶ 4. Plaintiffs claim the alleged alteration is material because it goes to the "key issue" of whether Mrs. Meadows was in fact in compliance with school policy on the dates in question, when she refused to give her driver's license to school personnel but did give her name to be manually entered into the Raptor system. *Id.* at ¶ 5.

Defendants deny Plaintiffs' allegations in full. Defendants submit the supplemental declaration of Diane Frost ("Suppl. Frost Decl."), the Deputy Superintendent for LTISD, who states Version 2 is in fact the official version of Regulation FFF, which is why it was produced in discovery and submitted as evidence with LTISD's motion for summary judgment.[6] Suppl. Frost Decl. at ¶¶ 2-3; 5. During the fall of 2006, the administration had not yet settled on a final official version of

---

[6] In fact, both Version 1 and Version 2 of Regulation FFF were submitted as evidence with LTISD's motion for summary judgment. *Id.* at ¶ 5.

Regulation FFF and therefore reviewed and revised it several times, based on input from principals. *Id.* at ¶ 6. Thus, Version 1 was attached to the motion for summary judgment (along with Version 2) for the purpose of showing the Court that "previous versions of Regulation FFF had existed prior to the current version of Regulation FFF," and as an example of the language considered by District administrators prior to settling on the official version of Regulation FFF (Version 2). *Id.* at ¶ 6.

The incidents that form the basis of the present lawsuit—namely, Mrs. Meadow's several visits to the school in the fall of 2006—occurred during the time this deliberative process was taking place. *Id.* at ¶ 7. Therefore, when Mrs. Meadows asked Frost to send her a copy of Regulation FFF, Frost sent the version that existed at the time of the request: Version 1. *Id.* She sent a copy of Regulation FFF to Mrs. Meadows on October 10, 2006, prior to the final revision of Regulation FFF, which occurred on October 12, 2006.[7] *Id.* Frost testifies she is not sure when the specific phrase in question was added to Version 1, but claims the electronic history for the computer document of Version 2 indicates it occurred sometime between October 10, 2009 and October 12, 2009. *Id.* at ¶ 8.

## II. Discussion

Considering all the foregoing, the Court finds Plaintiffs' motion is entirely frivolous and a waste of the Court's time and resources. The Court so finds for the following reasons.

### a. Mrs. Meadows' compliance with Regulation FFF was not an issue in the Court's decision

Most importantly, Plaintiffs are entirely incorrect in their claim that Mrs. Meadows' compliance or non-compliance with either version of Regulation FFF was a "key issue" in the

---

[7]Regulation FFF was last modified on October 12, 2006. *Id.* at ¶ 3.

Court's decision in this case. It was not. The Court's holding on summary judgment was expressly based on the fact Plaintiffs could not establish they were "deprived of a right 'secured by the Constitution and the laws' of the United States," as is required by § 1983. *See* 42 U.S.C. § 1983.

The crux of Plaintiffs' claims in this case was their (mistaken) belief they possess a constitutional right to be physically present with their children in the classroom to supervise their children's education. The Court disagrees. *See* Order [#51] at 11. The Court recognized in its order that although parents have a constitutional liberty interest "in the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000), neither the Supreme Court nor any other court has ever held the Constitution establishes a parental right to access a child's classroom or other school areas while school is in progress and other students are present. *Id.* In fact, the Court found the relevant case law directly contradicts Plaintiffs' position, and uniformly holds there is no parental right of access to a child's classes. *Id.* (citing *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999) ("School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property.")).

Specifically, the Court considered two highly instructive cases in its order: *Ryans v. Gresham*, 6 F. Supp. 2d 595, 601 (E.D. Tex. 1998); *Mejia v. Holt Public Schs.*, 2002 WL 1492205, at *4–6 (W.D. Mich. 2002). In *Ryans*, a mother was concerned her son was being mistreated by his teachers and classmates because he was African-American, and she was given permission to attend her son's classes. *Ryans*, 6 F. Supp. 2d at 597–98. After attending one class in particular, the teacher asked Mrs. Ryans to leave. *Id*. at 598. Mrs. Ryans refused to leave and was ultimately arrested for trespassing. *Id*. at 598–99. The Ryans brought suit under Section 1983 for, in part,

violation of their "constitutional right . . . to have access to their child's educational environment." *Id*. at 601 (citation omitted). The court rejected this claim on summary judgment, noting: "An exhaustive review of the case law pertaining to the constitutional right of parents to direct the education of their children discloses no holding even remotely suggesting that this guarantee includes a right to access to the classes in which one's child participates."[8] *Id*. at 601.

In *Mejia*, a father was accused of indecent exposure while waiting in his car to pick up his son from school, but was ultimately found not guilty of the charge in a criminal trial. 2002 WL 1492205 at *1. But following his acquittal, Mr. Mejia was nevertheless completely barred from entering school property or attending any school function. *Id*. Mr. Mejia and his wife brought suit, claiming a violation of "their fundamental right to participate in the education of their child." *Id*. at *2. The *Mejia* court rejected the claim at summary judgment, finding "a school may ban a person, including a parent, from going onto school property in order to preserve order in the educational process or to protect students from potential harm without violating any fundamental right to go onto or access school property," even despite the fact Mr. Mejia was found not guilty of the indecent exposure accusation. *Id*. at *4. The court specifically distinguished the general right to participate in a child's education recognized by the Supreme Court in *Troxel* from any specific right to enter school property: "While *Troxel* does mention that parents have the right to direct and control the education of their children . . ., nothing in that decision suggests that it includes the right to go onto school property, even if doing so is necessary to participate in the child's education." *Id*. at *5.

---

[8]The *Ryans* court reached the same conclusion under Texas law, specifically finding "[t]he rights afforded to parents of students under Texas law include no duty to provide parents with access to classes." 6 F. Supp. 2d at 602 n.16.

In their response to the motion for summary judgment, Plaintiffs argued the foregoing cases were distinguishable from their case because Mrs. Meadows had "committed no illegal act, was not disruptive, violated no rule or policy, nor acted offensively in any way." *See* Pls.' Resp. at 5. The Court expressly considered this argument and found it was not a valid distinction, for two reasons:

> First, while the facts of *Mejia* and *Ryans* may involve some level of disruption or disturbance, neither holding depends on that fact. In other words, neither case finds that when a parent has committed some bad act there is no constitutional right to access; rather, they each find no constitutional right to access period. *Ryans*, 6 F. Supp. 2d at 601 ("An exhaustive review of the case law pertaining to the constitutional right of parents to direct the education of their children discloses no holding even remotely suggesting that this guarantee includes a right to access to the classes in which one's child participates."); *Mejia*, 2002 WL 1492205 at *4. This conclusion is reinforced by the actual facts of each case. Mrs. Ryans had been given permission to attend her son's class and thus was not violating any rule, and Mr. Mejia had actually been acquitted of his alleged bad act. *Ryans*, 6 F. Supp. 2d at 598; *Mejia*, 2002 WL 1492205 at *1.
>
> Secondly, the undisputed evidence establishes Mrs. Meadows was in fact violating a "rule or policy" when she was denied access to the secure areas of the school, specifically Regulation FFF which required Mrs. Meadows to permit her information to be submitted through Raptor for a sex offender background check prior to being allowed unescorted access to the secure areas of the campus.

*See* Order [#51] at 13-14.

Ultimately, the Court concluded LTISD had not deprived Plaintiffs of their fundamental right to control their children or their education by denying Mrs. Meadows access to her child's classroom during school hours. *Id.* As indicated by the quote above, the Court's holding was in no way dependent on whether Mrs. Meadows had violated or not violated any version of Regulation FFF. In fact, the Court expressly noted the relevant precedent does not rely on any "bad act" by the parent when holding there is no such constitutional right. *Id.* (noting "neither case finds that when a parent has committed some bad act there is no constitutional right to access; rather, they each find no

constitutional right to access period."). Nor did the Court's own holding rely on any finding of non-compliance by Mrs. Meadows with any school policy. *Id.* Indeed, the phrase that was allegedly "altered" in Version 2 of Regulation FFF was never quoted nor cited by the Court in its order, and there is absolutely no intimation in the order that the phrase was ever considered by the Court in any way. Thus, Plaintiffs' insistence that the allegedly altered phrase was central to a "key issue" in the Court's holding mystifies the Court, and evidences either a deliberate misrepresentation of that holding or a bullheaded misunderstanding of it on the part of Plaintiffs.

Because the allegedly altered phrase was in no way central to the Court's order, it follows that even if LTISD and its counsel **had** fraudulently submitted an altered version of Regulation FFF (which Mrs. Meadows was shown not to have been in compliance with), their actions (however abominable) would not affect in the slightest the Court's holding that Plaintiffs were not, as a matter of law, deprived of a constitutional right under the substantive due process clause of the Fourteenth Amendment, and thus are not entitled to any relief on this basis under § 1983.[9]

### b. Mrs. Meadows was not in compliance with either version of Regulation FFF

Secondly, based on the undisputed record before the Court, Mrs. Meadows failed to comply with **both** versions of the policy on the instances in question; therefore, it makes no difference which version was consulted by the Court or the parties. Specifically, both versions of Regulation FFF allow that school principals and site administrators *may* allow a parent who refuses to present any form of identification some limited access to their child's school, based on the principal or

---

[9]The same analysis applies to Plaintiffs' substantive due process claim under the Texas constitution. *See Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556 (Tex. 1985) (applying federal equal protection analysis to equal protection claims under the Texas constitution); *and see Ryans*, 6 F. Supp. 2d at 602 n.16 (finding "[t]he rights afforded to parents of students under Texas law include no duty to provide parents with access to classes."). Thus, Plaintiffs' substantive due process claims under the Texas Constitution were also held to be without merit, under the same rationale, and likewise would not be affected by Plaintiffs' allegations in their motion for relief.

administrator's personal understanding of the situation and/or knowledge of the person in question.[10] However, both versions also require that "[s]uch persons, however, should be manually entered into the system by the campus administrator and have their names checked against the database (no more than twice)."

Thus, both Version 1 and Version 2 of Regulation FFF require manual entry of the parent's information into the Raptor system if the parent refuses to produce her driver's license, regardless of whether that parent's license has ever been scanned into the system before. For purposes of this policy, "[m]anual entry means that, rather than running the person's driver's license through the system, a staff member types into the system the name of the person and his or her date of birth." Suppl. Frost Decl. at ¶ 9. This way, the system can check the sex offender records even without the parent producing any form of identification. But it is undisputed Mrs. Meadows refused during the visits in question to allow manual entry of her name and date of birth into the Raptor system. *Id.*; Pl.'s Mot. for Reconsideration at ¶ 6.[11] Thus, she was not technically in compliance with either version of Regulation FFF. Despite her non-compliance, she was allowed entry to secure areas of the campus on at least two separate occasions and limited access to the campus on a third occasion. *Id.*

The Court again notes that whether Mrs. Meadows was or was not in compliance with Regulation FFF is, of course, a triviality. The issue is (and was) entirely irrelevant to the motion for

---

[10]Version 2, as quoted above, adds to the following qualifier: "... <u>if the driver's license has already been scanned into the system</u>."

[11]Mrs. Meadows specifically testified in her affidavit, attached to Plaintiffs' response to the motion for summary judgment, that after she refused to provide her driver's license, a school administrator asked her to orally provide her name and date of birth. Pls.' Resp. Ex. 1, Aff. of Yvonne Meadows ("Mrs. Meadows Aff.") at 5. Mrs. Meadows provided her name but refused to provide her date of birth, since the administrator "was eliciting the same information as was on my driver's license." *Id.*

summary judgment, in which the Court's "sole role and authority [was] to determine whether LTISD's policies violate the United States Constitution, federal law, or state law, not to decide whether LTISD's policies are the best ways to achieve the school's goals." *See* Order [#51] at 2. However, the Court concludes for the record that Mrs. Meadows was ***not*** in compliance with either version of Regulation FFF, and thus was not prejudiced in any way by the fact Version 2—a slightly different version from Version 1—was submitted as additional evidence for LTISD's motion for summary judgment.

        **c.**        **There is no evidence of wrongdoing on the part of LTISD or its counsel**

Finally, even aside from the fact Plaintiffs were in no way prejudiced by LTISD's production of Version 2 (as demonstrated above), Plaintiffs have wholly failed to show any "clear and convincing evidence...that Defendant [LTISD] and/or its attorneys engaged in misconduct," as they claim. *See* Pl.'s Mot. for Reconsideration at ¶ 2. In fact, Plaintiffs' claim is thoroughly irresponsible and incendiary, as it is unsupported by anything in the record. At most, Plaintiffs have revealed there existed a harmless misunderstanding between the parties about which version of Regulation FFF was in force during the incidents in question, or whether both versions were required to be submitted as evidence in this case. LTISD submitted both versions of Regulation FFF along with its motion for summary judgment, an act that hardly lends credence to the claim it or its attorneys "fraudulently altered" Version 1 in order to deceive the Court and/or Plaintiffs.

In conclusion, the Court finds absolutely no evidence to support Plaintiffs' claim there was intentional wrongdoing on the part of LTISD or its counsel. Furthermore, the Court finds the allegedly altered evidence made no difference to the outcome of this case, which was—and continues

to be—completely without merit. Plaintiffs' motion for relief from judgment is therefore DENIED in full.

## III. Warning

Finally, the Court expressly warns Plaintiffs and their counsel to read and review Federal Rule of Civil Procedure 11 before filing any future motions in this lawsuit. Rule 11 provides that when the attorney or an unrepresented party signs pleadings in a case, he must, under the law, be certifying to the best of his knowledge, information, and belief formed after an inquiry reasonable under the circumstances that the pleadings are not being presented for any improper purpose such as to harass or cause unnecessary delay or needless increase in the cost of litigation; that the claims and legal contentions are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law; and that the allegations of factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. FED. R. CIV. P. 11(b). Penalties for a violation of these rules include "an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c).

In its original order granting summary judgment, the Court warned all the parties that none of them "ha[d] acted like mature adults should act" in the course of this litigation. Order [#51] at 2. Plaintiffs were apparently unable to heed that subtle warning; thus, the Court warns them now as plainly as possible. This Court will not hesitate to impose sanctions should it be faced with a motion similar to that recently filed by Plaintiffs, filled with very serious allegations about the conduct of another attorney that were made in haste and without evidentiary support.

**Conclusion**

In accordance with the foregoing,

IT IS ORDERED that Plaintiffs Yvonne Meadows and Larry Meadows' Motion for Relief From Judgment and to Strike [#61] is DENIED in full.

SIGNED this the 4th day of January 2010.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE